# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

   Plaintiff,

  v.

Justin White,

   Defendant.

Case No. 22-cr-207 (JRT/ECW)

**ORDER AND
REPORT & RECOMMENDATION**

   This case is before the Court on Defendant Justin White's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 24); Defendant Justin White's Motion to Suppress Statements, Admissions and Answers (Dkt. 25); Defendant Justin White's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence (Dkt. 26); Defendant Justin White's Pro Se Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct (Dkt. 57); Defendant Justin White's Pro Se Motions and Memorandum for Suppression Due to Illegal Search in Seizure (Dkt. 58); and Defendant Justin White's Supplemental Pro Se Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct (Dkt. 80).  This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.    <u>PROCEDURAL BACKGROUND</u>

Defendant Justin White ("White" or "Defendant") is charged by an August 23, 2022 Indictment with one count of Possession with Intent to Distribute Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); one count of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime.  (Dkt. 1.)

On September 23, 2022, White's former attorney[1] filed the following suppression motions and a motion to dismiss on White's behalf:  Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 24); Motion to Suppress Statements, Admissions and Answers (Dkt. 25); Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence (Dkt. 26); Motion for Suppression and Dismissal Due to Entrapment and Outrageous Government Conduct (Dkt. 52); and Motion for Suppression and Dismissal Due to Entrapment and Outrageous Government Conduct (Dkt. 55).

Defendant Justin White also filed two pro se motions: Pro Se Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct (Dkt. 57); and Pro Se Motions and Memorandum for Suppression Due to Illegal Search in Seizure (Dkt. 58).[2]

---

[1]    Attorney James Ventura was appointed as White's counsel pursuant to 18 U.S.C. § 3006A.  (Dkt. 8.)

[2]    The Government moved to strike the pro se motions on the basis that White was represented by counsel, but subsequently withdrew the motion to strike after the Court granted White's motion to proceed pro se in this matter.  (*See* Dkts. 60, 68.)

After granting White's requests for continuances of the motions hearing (Dkts. 33 & 40), the scheduled January 17, 2023 hearing on the Motions was converted to a hearing on White's request for new counsel, which the Court denied (Dkts. 46 & 47). White sought and received another continuance (Dkts. 49 & 50), and then during the March 14, 2023 motions hearing, White brought an oral pro se motion to proceed without counsel, which the Court granted (Dkt. 66). At the same hearing, after proceeding pro se, White represented to the Court that he was no longer proceeding with the Motion for Suppression and Dismissal Due to Entrapment an Outrageous Government Conduct (Dkt. 52) and Motion for Suppression and Dismissal Due to Entrapment and Outrageous Government Conduct (Dkt. 55) that had been filed by former counsel, and withdrew those Motions. (Dkt. 68.)

The Court gave the Government until March 28, 2023 to file its brief in response to the Pro Se Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct and Pro Se Motions and Memorandum for Suppression Due to Illegal Search in Seizure and gave White until April 11, 2023 to file a reply brief. (Dkt. 68.) The Court also appointed Steven J. Wright as standby counsel for White. (Dkt. 69.)

On April 21, 2023, White's standby counsel filed a brief on White's behalf due to White's difficulties with the jail printer, as well as a letter asking the Court to accept the brief. (Dkts. 77, 78.) On April 24, 2023, the Court accepted Defendant's brief and exhibits and gave White until May 5, 2023 to file any additional exhibits. (Dkt. 79.) On April 28, 2023, White filed his supplemental Pro Se Motions and Memorandum for

Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct

(Dkt. 80) and exhibits (Dkt. 81).

The Motions are now ripe for a decision.

## II.  <u>DISCUSSION</u>

**A.  Motions for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct (Dkts. 57, 80)**

White asserts that it is alleged that he used an assumed name to complete an application to purchase a TDP 5 pill press from LFA Machines DFW, LLC ("LFA Machines").  According to White, pill press sales are regulated by the United States Drug Enforcement Agency ("DEA") and its regulations require a buyer of a pill press to fill out a due diligence form and provide identification.  (Dkt. 57 at 1-2 (citing 21 C.F.R. §§ 1310.06 and 1310.07); Dkt. 77 at 1; Dkt. 80 at 1.)  Indeed, White goes so far as to argue that LFA Machines needs DEA approval before any sale and that their services include technical support, which White asserts that he availed himself of with the knowledge of the DEA and now argues constituted receiving knowledge of how to commit a new crime.  (Dkt. 57 at 2, 3; Dkt. 77 at 2, 9-10; Dkt. 80 at 1-2.)  White references telephone calls, email communications, and meetings he had engaged in with representatives of LFA Machines.  (Dkt. 77 at 1-2.)  According to White, the DEA knew that he was trying to purchase the TDP 5 pill press (hereinafter "pill press") with a fictitious identification and knew where the pill press was being shipped, since when the machine was shipped the DEA was conducting surveillance to determine to whom the machine was being shipped.  (Dkt. 57 at 2; Dkt. 77 at 4; Dkt. 80 at 2, 4.)  White complains that instead of

stopping delivery (which he asserts the DEA should have done) without formal discovery of the type of criminality that was taking place, the DEA decided to investigate, waiting over 30 days before intervening and thereby allowing him to illegally possess the pill press. (Dkt. 57 at 2-3; Dkt. 77 at 2-4; Dkt. 80 at 2-4.) White contends that the conduct of the Government, through the agents of the DEA and associated law enforcement agencies, constitutes entrapment and outrageous governmental misconduct. (Dkt. 77 at 2; Dkt. 80 at 2.) White asserts that the DEA knew that the pill press was not readily available equipment and was landing in the wrong hands from the beginning of the investigation, which means that the DEA allowed or authorized him to possess contraband and to engage in a new criminal endeavor. (Dkt. 77 at 3, 5, 7-8; Dkt. 80 at 5.) According to White, helping him possess the pill press was an inducement to engage in criminal behavior because without that assistance, the pills could not exist. (Dkt. 77 at 7-8.) White concedes that while possession of the pill press itself is not illegal, similar to the possession of a firearm in and of itself, if the Government had reasonable suspicion that the pill press was not going to be used for its intended purpose or was acquired by illegal means, then Government could have intervened, confiscated the machine, or instructed LFA Machines not to sell it to the person who was trying to acquire it by illegal means, instead of engaging in an investigation and allowing him to purchase the pill press. (Dkt. 80 at 3.) White seeks suppression of all evidence of criminal activity discovered and dismissal of the Indictment due to the Government's purported unlawful activity. (Dkt. 57 at 4; Dkt. 77 at 10.) Given these arguments, the Court will address each of these defenses.

1.      **Entrapment**

"'Because it is an affirmative defense, entrapment is a question of fact and generally decided by a jury.'" *United States v. Hayes*, 44 F.4th 1134, 1139 (8th Cir. 2022) (quoting *United States v. Young*, 613 F.3d 735, 746 (8th Cir. 2010)). "A valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Id.*; *see also United States v. Tobar*, 985 F.3d 591, 592 (8th Cir. 2021) (same elements). "Inducement exists when the government 'implanted the criminal design' in the defendant's mind." *Tobar*, 985 F.3d at 592 (quoting *United States v. Young*, 613 F.3d 735, 747 (8th Cir. 2010), quoting *United States v. Eldeeb*, 20 F.3d 841, 843 (8th Cir. 1994)). "Inducement occurs when the government creates a substantial risk that an otherwise law abiding person will commit a criminal offense." *United States v. Warren*, 788 F.3d 805, 810 (8th Cir. 2015) (citation omitted). Inducement may include "pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship." *United States v. Clarett*, 907 F.3d 1100, 1102 (8th Cir. 2018) (marks and citation omitted). That said, "[w]hile inducement takes many forms, it requires more than a favorable opportunity to commit a crime." *Warren*, 788 F.3d at 810 (citing *United States v. Bugh*, 701 F.3d 888, 893 (8th Cir. 2012)). A defendant has the burden of establishing inducement. *See Tobar*, 985 F.3d at 592.

"Once government inducement is established by the defendant, the burden shifts to the Government to demonstrate beyond a reasonable doubt that the defendant was

predisposed to commit the crime." *Hayes*, 44 F.4th at 1140 (quoting *Young*, 613 F.3d at 747).

Here, the evidence before the Court is that law enforcement started investigating White in December 2021 after receiving a tip regarding the purchase of an LFA Machines pill press, which is capable of producing approximately 5,000 pills per hour. (Gov't Ex. 1 at 2.)  Law enforcement was aware that narcotics traffickers utilized pill press machines to produce pills that mimic the size and shape of scheduled prescription drugs, including Oxycodone, utilizing illicit narcotics, such as fentanyl, to produce these pills.  (*Id.*)

The tip regarding the purchase of the pill press provided the name of the purchaser and the shipping address for the pill press—James Watkins, at XXXX Arkwright North, St. Paul, MN 55160.  (*Id.* at 3.)  The DEA issued an administrative subpoena to LFA Machines for additional information regarding the purchase by James Watkins, which yielded the Arkwright address, telephone number, and Federal Express tracking number for the pill press, and a photocopy of a Minnesota driver's license bearing the name James Glen Watkins, located at XXX Sherburne Avenue, Saint Paul, Minnesota 55103. (*Id.*; *see also* Dkt. 77 at 75.)  The due diligence form from LFA Machines filled out by the purchaser included the name of the buyer as James Watkins, his company name, the XXXX Arkwright address, a statement that the pill press was going to be used to make Assam capsules that contain caffeine, his telephone number, and his email address.  (Dkt. 77 at 76; Dkt. 81 at 6.)  The form signed by the purchaser also notified him that he could not move the pill press from the address listed and he affirmed on the form that he was

not purchasing the pill press to commit a crime.  (*Id.*)  The form also notified him that the sale was subject to 21 C.F.R. § 1310.07.  (*Id.*)

Investigators queried Minnesota DVS Access to search the driver's license number and name, which resulted in no records found for either.  (Gov't Ex. 1 at 3.)  This led law enforcement to believe that the driver's license as well as the bank account of James Watkins used for the purchase of the pill press were fraudulent.  (*Id.*)

According to Federal Express tracking, the parcel was being shipped in two crates via FedEx Freight.  (*Id.*)  The shipment was scheduled to arrive on December 29, 2021 at the XXXX Arkwright address, and law enforcement established surveillance on that date.  (*Id.*)  Law enforcement observed a gold-colored Mercury bearing a Minnesota temporary license plate arrive at XXXX Arkwright Street North.  (*Id.*)  The Minnesota DVS Access search for that license plate identified the registered owner as Justin White and the photograph on the Minnesota driver's license provided to LFA Machines matched the driver.  (*Id.*)  White waited outside the residence and met the FedEx driver outside, and they both placed the two large crates in White's vehicle.  (*Id.*)  White ultimately took the crates into an apartment building located at XX 10th Street South, Apartment XXX, Minneapolis, Minnesota 55403.  The search of this residence did not occur until the end of January, when evidence of narcotics, firearms, currency, and the pill press were discovered.  (Gov't Exs. 2 & 5.)

As a starting point, the Court rejects White's argument that the DEA approves the sale of pill presses, such as the one at issue in this case.  The regulations relied upon by White do not require approval by the DEA, they only place a duty on LFA Machines in

terms of the information they must obtain from a buyer and the reports that they must generate. *See* 21 C.F.R. §§ 1310.03, 1310.06 and 1310.07.

The gravamen of White's argument is that because the Government knew that the pill press was being shipped to an individual who used a fake identification to procure the equipment, the DEA should have stopped the shipment instead of using it as a pretext to conduct a further investigation of him which led to the discovery of narcotics and firearms at his residence. In other words, White argues that because the Government let him have the pill press, they induced him to engage in further criminal activity. However, as stated previously, inducement exists when the government "'implanted the criminal design' in the defendant's mind." *Harriman*, 970 F.3d at 1057. Here, the criminal design was already in White's mind when he attempted to obtain the pill press with fake identification before any governmental involvement. The fact that the Government did not stop him from engaging in alleged further criminal activity, including contacting LFA Machines for advice on how to use the machine, is of no avail[3] and at most created a more favorable opportunity to commit a crime, which is insufficient for a finding of inducement. *See Warren*, 788 F.3d at 810. "'Where the government simply offers a defendant an opportunity to commit a crime, and the defendant promptly

---

[3]    The Court notes that Defendant has submitted several 2023 emails to and from LFA Machines, dated after the Indictment, regarding obtaining information on how to use the pill press. (Dkt. 77 at 74; Dkt. 81 at 4.) There is no indication or evidence that he received any such assistance during the events in question in 2022 or that the Government knew about his inquires at that time. Regardless, even if this did occur, and the Government did know, as set forth above, at most this would only create a more favorable opportunity to commit a crime and would not amount to entrapment or rise to the level of outrageous government conduct.

avails himself of the criminal opportunity, there is no entrapment.'" *Hayes*, 44 F.4th at 1140 (quoting *Combs*, 827 F.3d at 796.). Indeed, the Eighth Circuit has concluded that the Government's arranged, undercover purchase of a firearm from a known felon, standing alone, is not inducement in relation to a charge of a felon in possession of a firearm. *Id.* Here, the Government's inaction in stopping the alleged crime at issue constitutes less involvement than the Government's conduct in *Hayes*. Moreover, White is charged with the possession of narcotics and firearm-related counts, not with the possession of the pill press. For all of these reasons, the Court concludes that White has not met his burden with respect to inducement and his motions with respect to the defense of entrapment should be denied.

### 2. Outrageous Conduct

"[T]he defense of outrageous government conduct focuses on the government's actions." *United States v. Williams*, 720 F.3d 674, 685-86 (8th Cir. 2013) (quoting *United States v. Hunt*, 171 F.3d 1192, 1195 (8th Cir. 1999)). The Eighth Circuit has "left open the possibility that, in rare instances, the investigative methods employed by law enforcement could be so outrageous that due process bars the government from invoking the judicial process to obtain a conviction." *United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (cleaned up). "[T]he level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003) (cleaned up); *Combs*, 827 F.3d at 794-95 ("If applicable, this defense would be reserved for conduct that falls within the narrow band of the most intolerable government conduct, namely,

actions violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause.") (cleaned up); *United States v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012) ("Outrageous Government conduct requires dismissal of a charge 'only if it falls within the narrow band of the most intolerable government conduct.'") (quoting *United States v. Morse*, 613 F.3d 787, 792-93 (8th Cir. 2010)); *Hunt*, 171 F.3d at 1195 ("[G]overnment agents 'may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process.'" (quoting *United States v. Kummer*, 15 F.3d 1455, 1460 (8th Cir. 1994)).

In *Combs*, the Eighth Circuit found as follows:

> We are aware of only two reported court of appeals decisions—both from the 1970s—that have deemed the government's conduct so outrageous as to violate due process. In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978),[4] the Drug Enforcement Agency asked an informant to approach the defendant about building a methamphetamine laboratory. *Id.* at 375. The defendant agreed to help run the laboratory, and the government provided the informant with everything needed for the laboratory, including difficult-to-obtain chemicals and land on which to build the laboratory. *Id.* at 380. The defendant incurred no cost in building the laboratory, was subordinate in all ways to the informant, and did not even know how to manufacture methamphetamine. *Id.* at 380-81. On these facts, the Third Circuit concluded that "the governmental involvement . . . reached a demonstrable level of outrageousness." *Id.* at 380 (quotation marks omitted). The Ninth Circuit found a due process violation in *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), where an undercover agent encouraged the defendants to resume a discontinued bootlegging operation, provided necessary materials, threatened the defendants to accelerate production, and served as the defendants' sole customer. *Id.* at 786-87. The court overturned the conviction, holding that the government may not "involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Id.* at 787.

---

4    The Court notes that White relies on *Twigg* and *Greene* (*infra*) in support of his motions. (Dkt. 59 at 1; Dkt. 80 at 9.)

Assuming for the sake of analysis that government conduct like that exhibited in *Twigg* and *Greene* could establish a due process violation, the ATF's investigation in this case did not transgress the bounds of constitutionally permissible investigative methods. It is well accepted that "artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441, 53 S. Ct. 210, 77 L.Ed. 413 (1932); *see Jacobson v. United States*, 503 U.S. 540, 548, 112 S. Ct. 1535, 118 L.Ed.2d 174 (1992). A sting operation involving a fake stash-house robbery is a common investigative tool designed to prevent actual stash-house robberies—"largely unreported crimes that pose a great risk of violence in residential communities." *United States v. Black*, 733 F.3d 294, 309 (9th Cir. 2013); *see United States v. Warren*, 788 F.3d 805, 808 (8th Cir. 2015) (describing ATF's "Operation Gideon"). Infiltration of a criminal enterprise is a "recognized and permissible means of investigation" that often requires the government agent to employ subterfuge, to participate in the planning of a crime, and even to provide resources for the crime. *United States v. Sanchez*, 138 F.3d 1410, 1413 (11th Cir. 1998).

The governmental conduct here fell within this permissible law enforcement tradition. Law enforcement targeted Combs in this sting operation because he was part of what Edmond described as an established home-invasion robbery crew. Conduct by investigators to present a realistic stash-house robbery scenario, to establish rapport with Combs, or to facilitate commission of an offense by a preexisting robbery crew do not shock a universal sense of justice. We thus conclude that the prosecution did not violate Combs's rights under the Due Process Clause.

*Combs*, 827 F.3d at 795-76.[5]

---

[5]    White's reliance on *United States v. Bueno*, 447 F.2d 903 (5th Cir. 1971), and *United States v. West*, 511 F.2d 1083 (3d Cir. 1975), both cases from outside of the Eighth Circuit, also is misplaced. Prior to the decision of the Supreme Court in *Hampton v. United State*s, 425 U.S. 484 (1976), the Third and Fifth Circuits had held that a person could not be convicted of an offense involving contraband if the Government was the source of the contraband. *See United States v. West*, 511 F.2d 1083 (3d Cir. 1975); *United States v. Bueno*, 447 F.2d 903 (5th Cir. 1971). However, the Supreme Court in *Hampton* affirmed the conviction of a defendant accused of selling drugs that he claimed had been supplied by a law enforcement agent. A plurality of the Court favored a *per se* rule that would have rejected all due process or supervisory power challenges to the actions of a law enforcement agent in supplying contraband, leaving the defendant with the defense of entrapment. 425 U.S. at 485-91. The two concurring Justices declined to

The conduct of the Government in this case does not arise to the level of outrageous conduct.  The reverse sting operation in *Combs*, where the Eighth Circuit found no outrageous conduct, involved a much higher level of governmental involvement in the enablement of a crime than the Government's non-interference with White's actions while it further investigated a possible criminal enterprise involving White and the pill press.  "[T]he Government ha[s] no obligation to arrest [an individual] as soon as it had sufficient evidence to charge him."  *See United States v. Horton,* 756 F.3d 569, 574 (8th Cir. 2014) (citing *United States v. Lovasco*, 431 U.S. 783, 791-93 (1977)).  Further, unlike, the fact patterns in *Twigg* and *Green*, *supra*, where the Government actively encouraged the crimes, here the Government's alleged conduct was not intervening at the initial stages when White obtained the pill press of his own accord.  Under White's theory, law enforcement would be severely hampered in its investigation of ongoing criminal activity and enterprises if it was required to take immediate action as soon as it had any evidence of criminal activity.

White also relies on *Lard v. United States*, 734 F.2d 1290 (8th Cir. 1984), in support of his argument.  (Dkt. 57 at 10-11.)  In *Lard*, a law enforcement agent pushed

---

adopt this rule, but expressed the view that a defense based on outrageous misconduct would be unlikely to succeed in the context of a contraband offense:

> [T]he cases, if any, in which proof of predisposition is not dispositive will be rare. Police over-involvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement.

*Id.* at 495 n.7 (Powell, J., with whom Blackmun, J., joined, concurring).

the defendant to sell him a pipe bomb and the Eighth Circuit found as follows with respect to that law enforcement agent:

> Anderson's conduct **was not aimed at facilitating discovery or suppression of ongoing illicit dealings in unregistered firearms. Rather, it was aimed at creating new crimes for the sake of bringing criminal charges against Lard**, who, before being induced, was lawfully and peacefully minding his own affairs. *See United States v. Twigg*, 588 F.2d at 381. The government agents' overzealous efforts to instigate crime also involved rather extreme and questionable measures—including the smoking of marijuana—to gain Lard's confidence and lure him into committing a crime he was not otherwise ready and willing to commit. Concepts of fundamental fairness preclude us from putting our imprimatur on law enforcement overreaching conduct designed to instigate "a criminal act by persons 'otherwise innocent in order to lure them to its commission and to punish them.'"

734 F.2d at 1297 (emphasis added). Unlike *Lard*, the evidence before the Court is that White initiated obtaining the pill press with a fake identification, not the Government. Further, the Government had nothing to do with supplying him with the narcotics and firearms that make up the Counts of the Indictment. The Government's inaction was solely for discovery and investigative purposes and simply does not shock the conscience. Therefore, the motions to dismiss and suppress based on outrageous conduct should be denied.

**B.    Motions to Suppress Evidence (Dkts. 24 & 58) and Motion to Suppress Electronic Surveillance (Dkt. 26).**

White's initial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 24) was a boilerplate motion that merely sought "to suppress any physical evidence obtained as a result of a search and seizure of the controlled substances and firearms" to the extent that any "search warrant or seizure order issued in this case was issued without a sufficient showing of probable cause in the supporting affidavit, and was

therefore issued in error by the United States Magistrate Judge and that the search warrant or seizure order involved was executed in an illegal and unlawful manner, and not in good faith." (Dkt. 24.)  The Motion also sought suppression of any evidence obtained without a search warrant.  (*Id.*)  The Government represented in its response that it is aware of two principal searches that yielded physical evidence in the case: (1) a search of White's apartment in downtown Minneapolis and (2) a search of White and his vehicle conducted the same day.  (Dkt. 30 at 11.)  The Government asserts that both searches were conducted pursuant to search warrants.  (*Id.*)

As to White's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence (Dkt. 26), the Government asserts that there are only two tracking search warrants at issue, one for White's cell phone and one for his vehicle.[6]  (Dkt. 30 at 12.)

White's Pro Se Motions and Memorandum for Suppression Due to Illegal Search in Seizure (Dkt. 58) seeks suppression of evidence obtained on February 1, 2022 via

---

[6]    White also appears to challenge the tracking warrant for a 612-986-XXXX cell phone.  (Dkt. 77 at 35-43; Dkt. 80 at 17; Dkt. 81 at 20-28.)  The Eighth Circuit has concluded as follows:

> "To contest the validity of a search, a person must have a reasonable expectation of privacy in the place searched." *United States v. Randolph*, 628 F.3d 1022, 1026 (8th Cir. 2011). "Fourth Amendment rights are personal and may not be vicariously asserted." *Id*. (quotation omitted). With regard to the content of cell phones, "an accused must first establish that he personally has a legitimate expectation of privacy in the object that was searched." *United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014).

*United States v. Turner*, 781 F.3d 374, 382 (8th Cir. 2015).  However, the 612-986-XXXX cell phone was subscribed to by Nancy Ritzman and used by Case Ritzman (Dkt. 77 at 39), and White has not established nor made any argument to support the conclusion that he had a legitimate expectation of privacy in this phone or its location.

search warrant for his vehicle and the apartment at XX 10th Street South in Minneapolis, Minnesota. The search warrants related to the apartment are based on an initial January 25, 2022 Application seeking a "sneak and peak [sic]/delayed notice search warrant" and a February 1, 2022 Application for the residence for the seizure of evidence. (Gov't Exs. 1 & 2.)

White argues that the affidavits in support of these warrants contain lies and other representations in reckless disregard of the truth, which misled the issuing judge into believing a certain narrative and failed to notify the issuing judge that "approval of the [pill press] was directed by [the affiant's] agency in [sic] was thus employed for investigation purposes." (Dkt. 58 at 5.) Specifically, White asserts that the statement by the affiant that he received a tip that a James Watkins was receiving a pill press led the judge to believe that if it was not for the tip, "the defendant would have been successful with his plot of deceivingly receiving the [pill press], which ultimately lead [sic] the judge into believing that he revived [sic] it by illegal means," creating a "preconception inside of the magistrate conscious [sic] that defendant was in possession of machine [sic] that he wasn't authorized to have." (*Id.*) White asserts that by authorizing the sale of the pill press, the Government made the transaction legal and had the issuing judge known that, it would have been easier for the judge to understand that the DEA was using the pill press for investigatory purposes. (*Id.*) White argues that if the judge would have been aware of the original origin of the transaction, she may have demanded a more particular account of probable cause before signing off on the warrant. (*Id.*) White asserts that an evidentiary hearing under *Franks v. Delaware*, 438.U.S 154 (1978), is necessary to

16

determine the veracity of the affiant's representations in the application for the search warrant regarding the pill press.  (*Id.* at 6.)

White also takes issue with the affiant's reliance on "conclusory" statements based on the affiant's experience and training that drug traffickers usually use misleading information to procure pill presses.  (*Id.* at 6-7.)  White argues that he could have been trying to disguise himself as someone else in order to make a fraudulent purchase of merchandise for resale, and that it is easy for one to see why someone with a questionable background would use misleading information to protect themselves from getting discriminated against and prevented from receiving property that is available to the rest of society, as opposed to being a drug trafficker.  (*Id.*)  White argues that the affiant cannot use the evidence of one crime, *i.e.*, possible fraud, with no other corroborating information, to support probable cause for another crime.  (*Id.* at 10.)  White goes on to argue that the search warrant application does not contain the requisite probable cause to believe that the apartment sought to be searched contained evidence of narcotics, emphasizing the absence of statements that the pill press was functional, the apartment was actually being used for the manufacturing of a controlled substance, or that he was even aware of how to use the machine.  (*Id.* at 8-11.)

The Government counters that the search warrants are supported by sufficient probable cause. (Dkt. 70.)

The Court will proceed with addressing each of the search warrants at issue.

### 1.    Legal Standard

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was

probable cause for the search in the search warrant application and affidavit. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 238). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231). In reviewing the decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed. *See Gates*, 462 U.S. at 238-39 (citation omitted); *see also LaMorie*, 100 F.3d at 552 (citation omitted) ("Our duty as a reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge."). As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found within the four corners of the affidavit may be

considered in determining the existence of probable cause.'"  *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citing *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999), quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)); *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)).

The proponent of a suppression motion on the basis of a Fourth Amendment violation bears "the burden of establishing that his . . . Fourth Amendment rights were violated by the challenged search or seizure."  *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

Pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant may seek a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination.  *See United States v. Daigle*, 947 F.3d 1076, 1084 (8th Cir. 2020).  "However, in order to merit a *Franks* hearing, a defendant must show both (1) that the affiant knowingly and intentionally made false statements or made them in reckless disregard for the truth and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause."  *Id.* (cleaned up).  This "requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements."  *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015) (citation omitted); *see also Franks*, 438 U.S. at 171 ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.");  *United States v. Mathison*, 157 F.3d 541, 548

(8th Cir. 1998) ("A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing [under *Franks* ].").  Moreover, "[a] *Franks* hearing must be denied unless the defendant makes a **strong** initial showing of deliberate falsehood or reckless disregard of the truth."  *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (cleaned up) (emphasis added).

### 2.    Sneak and Peek Search Warrant for XX 10th Street South, Apartment XXXX

Applicant Walter Alvarado, a police officer from the Minneapolis Police Department, assigned to the DEA, asserted in a January 25, 2022 supporting application for the sneak and peek search warrant for the apartment at XX 10th Street South that there was an active investigation of White regarding controlled substance crimes involving methamphetamine and fentanyl.  (Gov't Ex. 1 at 2.)

The search warrant application contained information that law enforcement started investigating White in December 2021 after receiving a tip regarding the purchase of a pill press capable of producing approximately 5,000 pills an hour.  (Gov't Ex. 1 at 2; *see also* Dkt. 77 at 53-60; Dkt. 81 at 36-40.)  Based on Officer Alvarado's experience and training, he was aware that narcotics traffickers utilized pill press machines to produce pills that mimic the size and shape of scheduled prescription drugs, including Oxycodone, that utilize illicit narcotics, such as fentanyl, to produce these pills.  (Gov't Ex. 1 at 2.)

The tip regarding the purchase of this pill press provided that the name of the purchaser and the shipping address for the pill press was James Watkins, at XXXX

20

Arkwright North, St. Paul, MN 55160.  (*Id.* at 3.)  The DEA issued an administrative subpoena to LFA Machines for additional information regarding the purchase by James Watkins, which yielded the Arkwright address, a telephone number and Federal Express tracking number for the pill press, and a photocopy of a Minnesota driver's license bearing the name James Glen Watkins, located at XXX Sherburne Avenue, Saint Paul, Minnesota 55103.  (*Id.*)

Investigators queried Minnesota DVS Access to search the driver's license number and name, which resulted in no records found for either, leading law enforcement to believe that the driver's license as well as the bank account of James Watkins used for the purchase of this pill press were fraudulent.  (*Id.*)

According to Federal Express tracking, the parcel was being shipped in two crates via FedEx Freight.  (*Id.*)  The shipment was scheduled to arrive on December 29, 2021 to the XXXX Arkwright address, and law enforcement established surveillance on that date at that address.  (*Id.* at 3.)  Law enforcement observed a gold-colored Mercury bearing a Minnesota temporary license plate arrive at XXXX Arkwright Street North.  (*Id.*)  The Minnesota DVS Access search for that license plate identified the registered owner as Justin White, and the photograph on the Minnesota driver's license provided by the buyer of the pill press to LFA Machines matched the driver.  (*Id.*)  White waited outside the residence, met the Federal Express driver outside, and placed the two large crates in White's vehicle.  (*Id.*)  White and a person named Case Riztman ultimately took the crates into an apartment building located at the subject address of XX 10th Street South, Minneapolis, Minnesota 55403.  (*Id.* at 3-4.)

The search warrant application also provided the following information in support of the issuance of the sneak and peek warrant:

> In your affiant's training and experience, the aforementioned behaviors and actions by JUSTIN WHITE lead your affiant to believe that he is involved in the production and distribution of counterfeit controlled substances. JUSTIN WHITE'S tactics are similar to that of other criminals involved in the sale and distribution of narcotics. Utilizing a fraudulent driver's license, a fraudulent bank account and random addresses for delivery and drop off of such large pill press is a smart tactic to avoid detection of law enforcement.
>
> On January 13, 2022 and January 25, 2022, with permission from management on site, investigators entered the location of [XX] 10th Street South, [XX]th Floor, Minneapolis, MN. K9 handler Heather Jenson, police officer for Bloomington Police Department and her certified police K9 Kya went to the area of apartment [XXXX], which is rented by JUSTIN BELL. On both dates, Officer Jenson informed Special Agent Matthew Cutcher that her narcotics detection K9 gave a positive alert for narcotics on the address, [XX] 10th Street South, Apartment [XXXX], Minneapolis, MN 55403.
>
> Your affiant knows from his training and experience that drug traffickers often use residences as bases of operations to store drugs, proceeds from drug trafficking, and other evidence of criminal activity.
>
> An unannounced entry is necessary (to prevent the loss, destruction or removal of the objects of the search and to protect the safety of the peace officers) because: Agents and investigators involved in this investigation have collectively agreed that much is not yet known about the full depth and breadth of his drug distribution network.
>
> Therefore, agents and investigators have been vigilant about conducting their investigation as surreptitiously as allowable by law.
>
> In an effort to maintain both the integrity and covertness of the investigation, your affiant has reason to believe that a traditional search warrant allowing law enforcement to enter, search and leave notification of the search in/at the residence fully described in said search warrant would likely alert JUSTIN WHITE and co-conspirators to the active investigation into the drug activities of the distribution network. Based on this information, your affiant is respectfully requesting that the court, after a thorough review of said search warrant, allow your affiant and others under his direction and control the

ability to sneak into the residence to search for the items described in said search warrant.

The type of search warrant your affiant is requesting is recognized by the courts and is often referred to as a "sneak and peek or delayed notice" search warrant. It authorizes law enforcement officials charged with executing the search warrant to enter the premises without notification, permission or knowledge of the owner and/or occupants, so law enforcement can clandestinely search the premises. Generally, law enforcement will not seize items of evidentiary value during the execution of the search warrant; rather law enforcement will merely search and photograph items of evidentiary value. In addition, a copy of the search warrant is not left behind for doing so would negate of the [sic] search. Lastly, notification of the search warrant is delayed so as not to alert the subjects of an active investigation into their activities.

Based upon the information fully set forth in said search warrant, your affiant respectfully requests that the court issues a sneak and peak [sic]/delayed notice search warrant granting your affiant and others under his direction and control authority to surreptitiously enter the residential building described in said search warrant to search for and document the items described on the face of said search warrant. Law enforcement does not intend to seize any items of evidentiary value during the execution of said search warrant. However, if agents locate items (e.g., firearms or large quantities of controlled substances or drug proceeds) of evidentiary value that may necessitate the need for seizure, agents will author a traditional search warrant and bring it to the issuing judge for review before seizing the items.

Your affiant requests that the court delay notification to JUSTIN WHITE and known coconspirators as to the existence of said search warrant for a period of sixty (60) days or until the commencement of criminal proceedings, whichever comes first.[7]

---

[7]    The Court notes that the DEA and FBI executed this search warrant.  (*See* Gov't Ex. 2 at 7.)  Even assuming that Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3103a apply to the execution, White made no argument regarding the 60-day delay authorized by the warrant, and in any event, there is no prejudice to White resulting from the 60-day delay, as the search warrant was signed on January 26, 2022 and law enforcement executed the second search warrant for the seizure of physical evidence (for which White would have received notice) on February 1, 2022.  *See United States v. Welch*, 811 F.3d 275, 279 (8th Cir. 2016) ("[A] Rule 41 violation amounts to a violation of the Fourth Amendment warranting exclusion 'only if a defendant is prejudiced or if

(Gov't Ex. 1 at 4-5.)

### a.    Motion for *Franks* Hearing

As stated above, White makes a *Franks* argument that the supporting affidavit misled the issuing judge into believing a certain narrative and failed to notify the issuing judge that "approval of the [pill press] was directed by [the affiant's] agency in [sic] was thus employed for investigation purposes." (Dkt. 58 at 5.) Specifically, White asserts that the statement by the affiant that he received a tip that a James Watkins was receiving a pill press led the issuing judge "to believe that if it wasn't for the tip the defendant would have been successful with his plot of deceivingly receiving the [pill press], which ultimately lead [sic] the magistrate into believing that he revived [sic] it by illegal means," creating a "preconception inside of the magistrate conscious [sic] that defendant was in possession of machine [sic] that he wasn't authorized to have." (*Id.*) White asserts that by authorizing the sale of the pill press, the Government made the transaction legal and had the issuing judge known that, it would have been easier for the issuing judge to understand that the DEA was using pill press for investigatory purposes. (*Id.*)

The Court rejects White's *Franks* argument. "A court must review the sufficiency of a search-warrant affidavit using a 'common sense' and not a 'hypertechnical' approach." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007). The application contained information that law enforcement received a tip regarding the purchase of a pill

---

reckless disregard of proper procedure is evident.'") (quoting *United States v. Spencer*, 439 F.3d 905, 913 (8th Cir. 2006)).

press capable of producing approximately 5,000 pills an hour and a statement that through training and experience, the affiant was aware that narcotics traffickers utilize pill press machines to produce pills that mimic the size and shape of scheduled prescription drugs and utilize illicit narcotics to produce these pills; that the driver's license used to purchase the pill press (listing James Watkins) was fake; that the DEA and FBI surveilled the delivery of the pill press, confirmed that the person accepting the press was White and that his picture matched the picture on the Watkins driver's license; and that these agents watched Watkins take the pill press from XXXX Arkwright Street to the XX 10th Street South apartment complex. (Gov't Ex. 1 at 3-4.) The application is clear that the DEA and FBI did not intervene at this time and instead continued their investigation of White. There is no omission. The plain language of the affidavit makes it clear that law enforcement allowed White to possess the pill press even though he used a fake identification to procure the device, continued their investigation once they determined who came into possession of the device, and that they were going to use his possession of the pill press to demonstrate probable cause to search the XX 10th Street South apartment. As such, the Motion for a *Franks* hearing is denied as to all the search

warrants addressed in this Report and Recommendation related to the representations made regarding the pill press in their respective supporting applications.[8]

### b.    Probable Cause for the January 25, 2022 Sneak and Peek Warrant

As a starting point, to the extent that White asserts that the warrants for the XX 10th Street South apartment should be suppressed because they are based on information gathered through entrapment or outrageous conduct of the Government, the motions to suppress should be denied for the reasons stated forth above with respect to the motions to dismiss.  (*See supra,* Sections II.A.)  And as stated previously, with respect to probable cause, this Court's role is simply to determine whether the issuing court had a substantial basis for making the "practical, common-sense decision" it did about whether there was a "fair probability" that officers would discover evidence of a crime at the location to be searched.  *See Gates,* 462 U.S. at 238.

Here, the supporting affidavit for the January 25, 2022 sneak and peek warrant contained information regarding a tip about an individual purchasing a pill press; information based on training an experience that such pill presses are used by narcotics

---

[8]    The majority of courts within this District have treated a motion for a *Franks* hearing as a non-dispositive motion.  *See, e.g.*, *United States v. Edwards*, No. 21-CR-255 (NEB/ECW), 2022 WL 4112436, at *3 n.3 (D. Minn. June 21, 2022), *R. & R. adopted*, 2022 WL 3536135 (D. Minn. Aug. 18, 2022); *United States v. Hari*, No. CR181501 (DWF/HB), 2019 WL 7041849, at *1 (D. Minn. Dec. 20, 2019) ("Motions for *Franks* hearings are non-dispositive and, therefore, reviewed for clear error.") (citation omitted); *United States v. Mays*, Crim. No. 19-75, 2019 WL 4565636, at *4 (D. Minn. Sept. 20, 2019) (collecting cases).  Here, the Court decides White's request for a *Franks* hearing in this Report and Recommendation, as opposed to the order deciding the other non-dispositive motions, because the *Franks* issues are intertwined with the Motion to Suppress.

traffickers to produce counterfeit medications, including Oxycodone pills using fentanyl; confirmation by law enforcement that the identification to purchase the pill press was fake; information regarding the surveillance of the pill press delivery to an individual in a vehicle, which officers determined based on the license plate belonged to White; confirmation that White matched the picture of Watkins in the fake identification used to purchase the pill press; law enforcement surveillance of White taking the pill press to the apartment building located at XX 10th Street South; the affiant's belief, based on training and experience, that White was involved in the production and distribution of counterfeit controlled substances, as his tactics of utilizing a fraudulent driver's license, a fraudulent bank account, and random addresses for delivery and drop off of such a large pill press were smart tactics to avoid detection of law enforcement and were similar to the tactics used by other criminals involved in the sale and distribution of narcotics; the fact that law enforcement received permission from the apartment management to enter with a certified canine on January 13, 2022 and January 25, 2022 and that on both occasions, the canine positively alerted for narcotics in the area outside the subject apartment (rented in the name of Justin Bell); and the affiant's statement that based on his training and experience, drug traffickers often use residences as bases of operations to store drugs, proceeds from drug trafficking, and other evidence of criminal activity.  (Gov't Ex. 1.)

White takes issue with the application's reliance on the "conclusory" assertions from Officer Alvarado based on his training and experience.  (Dkt. 58 at 6-8; Dkt. 77 at 13, 16; Dkt. 80 at 13, 16.)  However, issuing judges may rely on warrant applications that include opinions based on officers' training and experience.  *See*, *e.g.*, *United States v.*

*Turner*, 953 F.3d 1017, 1020 (8th Cir. 2020) (finding that probable cause was supported by detective's knowledge through training and experience that drug traffickers use rental cars to transport drugs and money); *United States v. Tellez*, 217 F.3d 547, 549 (8th Cir. 2000) ("In this case there was evidence that [the defendant] was engaged in a continuing course of criminal activity, and we believe that it could fairly be inferred that he was keeping a supply of drugs and perhaps other evidence relating to his drug dealing in his home.  Although, it is true that neither the informant nor the detective had actual knowledge that contraband was in [the defendant's] home, absolute certainty was not necessary: a fair probability is all that is required."); *United States v. Juneau*, No. 19-CR-274 (WMW/KMM), 2021 WL 806368, at *2, *5 (D. Minn. Mar. 3, 2021) (finding that, based on GPS tracking of defendant's vehicles, the detective reasonably suspected that defendant's visits to a residence—"several of which occurred in the middle of the night and were only several minutes in duration"—were consistent with drug trafficking). Moreover, probable cause does not require officers to rule out White's explanation for suspicious facts, such as his assertions that the fraudulent purchase of the pill press could have been for resale, as opposed to narcotics activity (*see* Dkt. 58 at 6-7).  *See United States v. Meyer*, 19 F.4th 1028, 1032 (8th Cir. 2021) (citation omitted); *see also United States v. Perry*, 908 F.3d 1126, 1129-30 (8th Cir. 2018) ("[Defendant's] possible innocent explanation did not require the officers to disregard other, less innocent possibilities or to ignore the other circumstances indicating guilt.").

In any event, although each piece of information stated in the affidavit may not individually provide sufficient probable cause for the warrant to issue, taken together and

given the totality of the circumstances, especially in light of the transport of the pill press obtained through fraudulent means to the subject apartment complex and the two positive canine alerts for narcotics outside of the apartment, a reasonable person could believe there was a fair probability that evidence of a narcotics trafficking crime would be found at the XX 10th Street South apartment.

The Court acknowledges that White challenges the reliance in the search warrant application on the two dog sniffs outside his apartment, as they were performed without a search warrant.  (Dkt. 58 at 13; Dkt 77 at 14-15; Dkt 80 at 14-15, 18.)  In *Florida v. Jardines*, the United States Supreme Court found that a drug dog sniff on the front porch of a house without a search warrant is an unlawful intrusion on the curtilage of a home. 569 U.S. 1, 6-7 (2013).  Prior to *Jardines*, the Eighth Circuit rejected a Fourth Amendment challenge to a drug dog sniff outside an interior apartment door in *United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010).  However, as the Eighth Circuit explained in 2022, as of 2019 it had "neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway."  *United States v. Perez*, 46 F.4th 691, 697 (8th Cir. 2022); *see also United States v. Navarrete-Rivera*, No. 22-CR-0052 (DWF/JFD), 2022 WL 18587736, at *6 (D. Minn. Nov. 21, 2022) ("Consequently, at the time of the dog sniff in this case, *Scott* was still the law in the Eighth Circuit. When Kirk sniffed the exterior door of Mr. Navarrete-Rivera's apartment, the Eighth Circuit had neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway.  *Scott* is still the law in this Circuit, and under *Scott*, a dog sniff of an exterior apartment door opening into a common hallway is

constitutional.") (marks omitted), *R. & R. adopted*, 2023 WL 142806 (D. Minn. Jan. 10,

2023).  In *United States v. Hines*, 62 F.4th 1087 (8th Cir. 2023), relied upon by White

(Dkt. 77 at 14; Dkt. 80 at 14), the Eighth Circuit did not address the district court's

determination that the warrantless canine sniff of the curtilage of Hines's residence was

an illegal search, but rather relied on *Perez* and determined that regardless on the

constitutionality of the canine sniff, the *Leon* good faith exception applied to the search

warrant that relied on the sniff.  *Id.* at 1093.  Given that *Scott* remains the law of the

Eighth Circuit and *Jardines* did not speak to the constitutionality of a canine sniff in a

common hallway outside an apartment, the Court does not find that the canine sniff

violated the Fourth Amendment.[9]

For all of these reasons, the motions to suppress evidence with respect to the

January 25, 2022 sneak and peek warrant should be denied.

### 3.    February 1, 2022 Search Warrant (Gov't Ex. 2)

The application for the February 1, 2022 search warrant for the apartment located

at XX 10th Street South and garage associated with the apartment, White's person, and

White's vehicle included the information contained in the application for the January 25,

---

[9]    The Court also rejects White's argument that police had trespassed in the apartment building's hallway or otherwise illegally entered the building to speak with building management for investigative purposes.  (Dkt. 80 at 13.)  Law enforcement received consent to be in the building from the management (Gov't Ex. 1 at 5), and in any event, White, as a tenant did not have a reasonable expectation of privacy in the common areas of his rental buildings, *see Azam v. City of Columbia Heights*, 865 F.3d 980, 989-90 (8th Cir. 2017).

2022 sneak and peek search warrant (Gov't Ex. 2 at 3-6) as well as the following

information:

> For the past approximately two weeks, Agents have conducted surveillance on the door to apartment [XXXX]. Agents have observed WHITE to be coming and going regularly from the apartment. Agents have not observed any other individuals coming and going from apartment # [XXXX].

> For the past approximately two weeks, Agents have conducted surveillance on WHITE driving the grey Land Rover with temp tag [XXXX]9550. During the course of the surveillance, Agents have observed WHITE to make several short term stops at different locations. On one particular occasion, Agents observed WHITE stop in the area of the Target store located at 900 Nicollet Ave S. WHITE pulled his vehicle to the curb. A short time later Agents observed a male walking on sidewalk get into the front driver's seat of WHITE's Land Rover. Approximately one minute later, the male passenger exited the vehicle and continued walking on the sidewalk. WHITE then immediately left the area. In your affiant's training and experience, this type of activity in indicative of narcotics distribution.

> On 01/26/22, TFO Walter Alvarado of the Minneapolis DEA applied for a no knock entry "sneak and peek" search warrant for the address of [XX] 10th Street South #[XXXX], Minneapolis, MN. The search warrant was reviewed and subsequently signed by the Honorable Judge Rachel Hughey of the Hennepin County Court bench.

> This type of search warrant is recognized by the courts and is often referred to as a "sneak and peak [sic] or delayed notice" search warrant. It authorizes law enforcement officials charged with executing the search warrant to enter the premises without notification, permission or knowledge of the owner and/or occupants, so that law enforcement can clandestinely search the premises. Generally, law enforcement will not seize items of evidentiary value during the execution of the search warrant; rather law enforcement will merely search and photograph items of evidentiary value. In addition, a copy of the search warrant is not left behind for doing so would negate the purpose of the search. Lastly, notification of the search warrant is delayed so as not to alert the subjects of an active investigation in to their illegal activities. However, if agents locate items (e.g., firearms or large quantities of controlled substances or drug proceeds) of evidentiary value that may necessitate the need for seizure, agents are to author a traditional search warrant and bring it to the issuing judge for review before seizing the items.

On 02/01/22 at approximately 0900 hours, Agents with the Minneapolis DEA and the FBI executed the aforementioned search warrant. Upon entering the residence, Agents observed the following: two handguns, magazines and ammunition for the handguns; the TDP 5 pill press with blue powder on, in and around the machine; additional supply of blue powder; several bags of additional powders commonly used to "cut" illicit narcotics when pressing them into pills; at least on baggie of small blue pills commonly known as "M30" pills.

At the time of the writing of this search warrant, Agents are inside the residence located at [XX] South 10th Street #[XXXX], awaiting the review and authorization of this search warrant.

(*Id.* at 6-7.)

Outside of the arguments already raised by White as to the January 25, 2022 sneak and peek warrant (Dkt. 77 at 16), *supra*, White argues that any observations of law enforcement of him engaging in a drug trafficking transaction arose from the misconduct of the DEA in allowing him to possess the pill press. (Dkt. 77 at 15-16.) The Court rejects this argument for the same reasons this Court rejected his motion related to entrapment and outrageous conduct. (*See supra*, Section II.A.) White also contends that the search warrant is void as to the apartment because the search was executed prior to the issuance of the search warrant. (Dkt. 77 at 17.) The Court assumes that White is referring to the presence of the agents in the apartment before they obtained the warrant to seize physical evidence, however these agents were inside the apartment as part of the valid sneak and peek warrant addressed in Section II.B.2 to this Report and Recommendation.

The supporting affidavit for the February 1, 2022 search warrant application contained information regarding a tip about an individual purchasing a pill press; the

affiant's statement that based on her training and experience, such pill presses are used by narcotics traffickers produce counterfeit medications, including Oxycodone pills using fentanyl; confirmation by law enforcement that the identification to purchase the pill press was fake; information regarding the surveillance of the pill press delivery to an individual in a vehicle, which officers determined based on the license plate belonged to White; confirmation that White matched the picture of Watkins in the fake identification used to buy the pill press; law enforcement surveillance of White taking the pill press to the apartment building located at XX 10th Street South; the fact that law enforcement received permission from the apartment management to enter with a certified canine on January 13, 2022 and January 25, 2022 and that on both occasions, the canine positively alerted for narcotics in the area outside the subject apartment (rented in the name of Justin Bell); that based on the affiant's training and experience, drug traffickers often use residences as bases of operations to store drugs, proceeds from drug trafficking, and other evidence of criminal activity; that officers conducting surveillance had only observed White coming and going from the apartment at issue; that law enforcement had observed White for an approximately two-week period making several short stops in a Land Rover[10] registered in his name, including at least in one instance observing him engage in what appeared to be, based on their experience and training, a drug transaction; and that the sneak and peek warrant had been executed that same day with law enforcement

---

[10]     The vehicle is described as a "Land Rover" and "Range Rover" in different warrant applications but the temporary license number is the same in the applications. (*Compare* Gov't Ex. 2, *with* Gov't Ex. 4.)

observing two handguns, magazines, and ammunition for the handguns, the pill press with blue powder on, in, and around the machine, an additional supply of blue powder, several bags of additional powders commonly used to "cut" illicit narcotics when pressing them into pills, and at least one baggie of small blue pills commonly known as "M30" pills.  (Gov't Ex. 2.)

Given the totality of the circumstances, especially in light of the transport of the pill press obtained through fraudulent means to the apartment by White, the two positive canine sniffs outside of the apartment, the observation of White engaging in what appeared to be narcotics trafficking in the Land Rover, and the discovery of firearms, the pill press, and possible narcotics when executing the January 25, 2022 sneak and peek search warrant, this Court concludes that a reasonable person could believe there was a fair probability that evidence of a narcotics trafficking crime would be found at the apartment, in the Land Rover, and on White's person.  Therefore, the motions to suppress the February 1, 2022 search warrant should be denied.

### 4.      January 7, 2022 Tracking Warrant for 763-606-XXXX

On March 6, 2019, pursuant to 18 U.S.C. §§ 2703 (d), 3122 (a)(2), and 3123 and Minn. Stat. §§ 626A.36 -.42, Hennepin County District Judge Bridget Sullivan issued a search warrant authorizing the installation and use of a pen register and trap and trace device for the 763-606-XXXX cellular phone.  (Gov't Ex. 3; Dkt. 77 at 27-33.)  The information sought included caller identification (incoming and outgoing telephone numbers) for the number.  (*Id.*)  In addition, the search warrant authorized disclosure of

the cellular tower location and service information, global position system ("GPS")

information, and tracking as it related to the 763-606-XXXX cellular phone. (*Id.*)

The relevant portions of the probable cause for the search warrant set forth in

Officer Alvarado's January 6, 2022 application provide as follows:

> Your affiant started an investigation into JUSTIN WHITE in December
> 2021 after receiving a tip regarding the purchase of a LFA Machines DFW,
> LLC pill press model TDP 5. This pill press is capable of producing
> approximately 5,000 pills an hour. Through training and experience, your
> affiant is aware that narcotics traffickers utilize pill press machines to
> produce pills that mimic the size and shape of scheduled prescription drugs
> and utilize illicit narcotics as the material used to produce these pills. For
> example, counterfeit Oxycodone pills known as "blues, Mbox or M30s"
> have become a pandemic in Minneapolis and the surrounding areas. These
> pills are produced with fentanyl, a dangerous drug linked to numerous
> overdoses and overdose deaths in the metro area.

> The tip regarding the purchase of this TDP 5 provided the name of the
> purchaser and the shipping address for the TDP 5. The tip provided, **JAMES
> WATKINS**, **[XXXX] Arkwright Street North, St. Paul, MN 55160**.
> Special Agent Matthew Cutcher of the Drug Enforcement Administration
> issued an administrative subpoena to LFA Machines DFW, LLC for
> additional information regarding the purchase by **JAMES WATKINS**.
> LFA Machines DFW, LLC provided the following information for the
> purchaser, **JAMES WATKINS, [XXXX] Arkwright Street North, Saint
> Paul, MN 55160. Telephone number 763-606-[XXXX] and Federal
> Express Shipping tracking number.** LFA Machines DFW, LLC also
> provided a photocopy of a Minnesota Driver's License [**#XXXX-XXX-
> XXX-XXX**], bearing the name **JAMES GLEN WATKINS, [XXX]
> Sherburne Avenue, Saint Paul, MN 55103**.

> After querying the Minnesota DVS Access to search the driver's license
> number and name resulted in no records found for neither the name nor the
> driver's license number, leading your affiant to believe that the driver's
> license as well as the bank account of **JAMES WATKINS** used for the
> purchase of this pill press are fraudulent.

> According to Federal Express tracking, the parcel was being shipped in two
> crates via FedEx Freight. The shipment was scheduled to arrive on
> December 29, 2021 to **[XXXX] Arkwright Street North, Saint Paul, MN.**

On December 29, 2021, your affiant and members from the Drug Enforcement Administration and the Federal Bureau of Investigations conducted surveillance at **[XXXX] Arkwright Street North, Saint Paul, MN**. At approximately 0948 hours, Special Agent Cutcher observed a gold colored Mercury bearing Minnesota Temporary License Plate [XXXXXXX] arrive at **[XXXX] Arkwright Street North**. Minnesota DVS Access search regarding that license plate provided the registered owner as **JUSTIN WHITE [ ].** Special Agent Cutcher confirmed the driver of that vehicle was **JUSTIN WHITE** and the photograph on the Minnesota Driver's License provided to LFA Machines DFW, LLC matched **JUSTIN WHITE. JUSTIN WHITE** waited inside the vehicle and never made contact with any resident located at **[XXXX] Arkwright Street North.**

At approximately 1100 hours, Special Agent Cutcher observed a FedEx truck arrive at the listed location and **JUSTIN WHITE** exited the vehicle and waved down the driver of the FedEx truck. The FedEx driver assisted **JUSTIN WHITE** placing both large crates inside the vehicle that **JUSTIN WHITE** was operating. From the time **JUSTIN WHITE** arrived at the listed location and the FedEx Truck arrive, Special Agent Cutcher observed **JUSTIN WHITE** utilizing a cellular telephone.

At approximately 1145 hours, Special Agent Cutcher observed **JUSTIN WHITE** depart the area in the gold Mercury with both crates inside the vehicle. The surveillance team followed **JUSTIN WHITE** to the 500 block of Edmund Avenue, Saint Paul, MN. At approximately 1215 hours, Task Force Officer Paul Stenglein observed a meeting between **JUSTIN WHITE** and **CASE RITZMAN**, who exited the residence located at **[XXX] Edmund Avenue, Saint Paul, MN**. **CASE RITZMAN** and **JUSTIN WHITE** were looking at the crates inside the vehicle that **JUSTIN WHITE** was operating. The meeting between **JUSTIN WHITE** and **CASE RITZMAN** ended at approximately 1220 hours and **JUSTIN WHITE** departed the area alone in the gold Mercury.

The surveillance team followed **JUSTIN WHITE** to **[XX] 10th Avenue South, Minneapolis, MN**, who parked at approximately 1252 hours. Task Force Officer Carrie Donarski and Special Agent Mike Cannizzaro observed **JUSTIN WHITE** exit the vehicle and **CASE RITZMAN** meeting with **JUSTIN WHITE**. Both **JUSTIN WHITE** and **CASE RITZMAN** removed both crates from the vehicle and left them in an apartment located in the apartment building located at **[XX] 10th Avenue South, Minneapolis, MN**. At approximately 1320 hours, Special Agent

Cutcher observed both **JUSTIN WHITE** and **CASE RITZMAN** leave the apartment building and departed in separate vehicles.

Special Agent Cutcher served an administrative subpoena to **T-Mobile** requesting information on **763-606-[XXXX]**. According to **T-Mobile**, there was several contacts on December 29, 2021 between **763-606-[XXXX]** and **612-986-[XXXX]**. Special Agent Cutcher served an administrative subpoena to AT&T regarding subscriber information for **612-986-[XXXX]**. According to AT&T, **612-986-[XXXX]** is subscribed to Nancy Walter W. RITZMAN and the current user is **CASE RITZMAN**, [XXXXX] County Road M, Grantsburg, WI 54840.

In your affiant's training and experience, the aforementioned behaviors and actions by **JUSTIN WHITE** lead your affiant to believe that he is involved in the production and distribution of counterfeit controlled substances. **JUSTIN WHITE'S** tactics are similar to that of other criminals involved in the sale and distribution of narcotics. Utilizing a fraudulent driver's license, a fraudulent bank account and random addresses for delivery and drop off of such large pill press is a smart tactic to avoid detection of law enforcement.

Based on your affiant's training and experience, your affiant knows that examining call detail records and historical cell site data will aid Law Enforcement in identifying possible co-conspirators as well as previous locations that **JUSTIN WHITE** has been traveling to. Your Affiant believes that examining this this information will assist Law Enforcement in locating JUSTIN WHITE and places of operation.

(Gov't Ex. 3 at 4-5.)

Probable cause is required for the cell phone orders.  *See United States v. Thompson*, 976 F.3d 815, 823 (8th Cir. 2020) (citing *Riley v. California*, 573 U.S. 373, 386 (2014)).  White argues that the search warrant lacks probable cause given that the majority of the information it relies on results from entrapment or outrageous conduct by the Government in allowing him to illegally possess the pill press and because it relies in part on the training and experience of the law enforcement.  (Dkt. 77 at 17.)  The Court has already rejected those arguments (*see supra*, Section II.A) and does so here for the

same reasons.  Further, the application stated the subject number was used in conjunction with the fraudulent procurement of a pill press that, based on Officer Alvarado's experience and training, is used by narcotics traffickers to produce counterfeit prescription drugs using illicit narcotics, including fentanyl; that White was seen by law enforcement using a cell phone on December 29, 2021 (the date the pill press was delivered); and that the cell number at issue made a call on the same date to the cell phone number of at least one individual (Case Ritzman) observed moving the pill press from the delivery address during law enforcement's surveillance.  Moreover, the Court recognizes "[a] cell phone is a durable, legal object likely to be found with its owner, unlike a drug stash or a murder weapon of which one would quickly dispose." *United States v. Grupee*, No. CRIM.A 08-10339-WGY, 2009 WL 4938669, at *2 (D. Mass. Dec. 15, 2009), *aff'd*, 682 F.3d 143 (1st Cir. 2012).  This information, taken together, leads this Court to conclude that there was a fair probability that contraband or evidence of a narcotics-related crime would be found by tracking the cell phone.  As such, the motions to suppress as to this search warrant should be denied on this basis.

**5.    January 27, 2022 Tracking Warrant for 2018 Range Rover Velar**

On January 27, 2022, Hennepin County District Judge Rachel Hughey issued a mobile tracking warrant for a 2018 Range Rover Velar with license plate number [XXXX9550].  (Gov't Ex. 4; Dkt 77 at 20-25.)  In his supporting affidavit for the tracking warrant, Officer Alvarado relied on virtually the same information pertaining to the procurement of the pill press by White using a fake identification, the delivery of the pill press to White, its transportation by White and Case Ritzman to the XX 10th Street

South apartment, and the two positive narcotics canine alerts on separate occasions outside of the subject apartment at that address, as he provided in the supporting application for the February 1, 2022 search warrant (Gov't Ex. 2). (*See* Gov't Ex. 4.) In addition, Officer Alvarado provided the following information in support of the issuance of the tracking warrant for the Range Rover:

> On January 24, 2022, Special Agent Kirk Johnson observed **JUSTIN WHITE** and **CASE RITZMAN** at iDeal Auto Imports, located at [XXXX[ Wallace Road, Eden Prairie, MN. Special Agent Kirk Johnson observed **JUSTIN WHITE** enter the 2018 Range Rover Velar from the auto dealership.

> On January 26, 2022, Special Agent Matthew Cutcher observed **JUSTIN WHITE** leave the garage area for [XX] 10th Street South, Minneapolis, MN in the **2018 Range Rover Velar MN plate [XXXX]9550**.

> On January 27, 2022, Special Agent Matthew Cutcher observed **JUSTIN WHITE** driving the **2018 Range Rover** WB on 9 St S and come to a stop at a red light on Nicollet Ave S. At the red light, a black male jumped inside the front passenger's seat. When the light changed, **JUSTIN WHITE** drove away and pulled over about two blocks away. Within 30 seconds or so, the black male who had jumped inside the passenger's seat exited the car and walked away. This area is notorious for drug trafficking, and it is one of the City's hotspots due to violence, crime and drugs. Based in your affiant's training and experience, this is a common behavior of drug traffickers – short and quick encounters during drug dealing. This is a behavior your affiant has learned to recognize over the years during patrol and drug operations.

> Based on the aforementioned information, your affiant therefore respectfully requests the permission of the court to install a mobile tracking device(s) to obtain real-time location/ Global Positioning System (GPS) information related to the movements of [sic] **2018 Range Rover Velar MN Plate [XXXX]9550**.

> Your affiant requests permission to track this object to obtain information related to the motor vehicle's or object's movement that will tend to show particular elements of a criminal activity or that the vehicle or object is involved in committing crimes as described in this affidavit.

Your affiant will install the mobile tracking device within the jurisdiction of the authorizing court. Your affiant respectfully requests permission to monitor and track the vehicle(s)/object(s) wherever the vehicle(s)/object(s) may travel as the vehicle/object is readily mobile and not confined to this judicial district. Additionally, your affiant requests permission of the court to replace and/or service the tracking device(s) at any time for the duration of this order, as necessary in order to keep the device(s) in proper working order during the authorization period.

Your affiant respectfully requests permission of the court to install this device for a period of 60 days or until the objective of the authorization is completed, whichever is less, unless extended by order of the court. Based on the information as provided in this affidavit, it is necessary to track this object for a continuing period of time to show the particular elements of criminal activity. These elements may occur over days, weeks, or months. Therefore, permission is sought to monitor the movements of this object for the authorization period of this order.

(Gov't Ex. 4 at 4-5.)

Installing a GPS tracker on a car is a Fourth Amendment search that generally requires probable cause and a warrant. *See United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019) (citing *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016)). White contends that the search warrant application lacks probable cause based on the outrageous conduct of the Government, impermissible reliance on officer training and experience, and the allegedly illegal canine sniffs outside of his apartment (Dkt. 77 at 16-17), arguments which this Court has rejected earlier in this Report and Recommendation. As to probable cause, the Eighth Circuit only requires "a 'nexus' between the evidence to be seized and the place to be searched, considering 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *United States v. Smith,* 21 F.4th 510, 515 (8th Cir. 2021) (quoting U*nited States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017)) (citation omitted).  Here, the supporting affidavit contained information

regarding White's fraudulent procurement of a pill press that, based on the training and experience of the affiant, is used in narcotics activity; White and Case Ritzman using a vehicle (albeit a different vehicle) to transport the pill press to the XX 10th Street South apartment building; the positive alerts by the canine outside the apartment on two occasions; surveillance by law enforcement of White and Case Ritzman entering a car dealership and White leaving in the Range Rover; that White was seen coming from the [XX] 10th Street South apartment garage in the Range Rover; and on at least one occasion on January 27, 2022, it appeared based on officer training and experience that White engaged in a narcotics transaction inside the Range Rover. This totality of the circumstances yields a fair probability that evidence of narcotics trafficking could be discovered by tracking the Range Rover, given the connection of possible drug trafficking to White and his use of vehicles, including the Range Rover, in this endeavor. As such, the Court finds that the January 27, 2022 Tracking Warrant for the 2018 Range Rover Velar warrant is supported by sufficient probable cause and the motions to suppress as to this search warrant should be denied.

### 6.    March 9, 2022 Search Warrant for Land Rover

On March 9, 2022, Hennepin County District Judge James Moore issued a search warrant for the 2018 Range Rover Velar with license plate number [XXXX]9550 to search for narcotics-related evidence and cellular phones. (Gov't Ex. 5; Dkt. 77 at 51-52.) In his supporting application for the tracking warrant, Officer Alvarado relied on virtually the same information pertaining to the procurement of the pill press set forth in the previous search warrant applications, and the following additional information:

41

On January 7, 2022, your affiant received a signed search warrant approved by Honorable Judge Bridget Sullivan authorizing the installation and use of a pen register, trap/trace device, electronic tracking device, global positioning system (GPS) technology and triangulation location on telephone number 763-606-[XXXX]. This telephone number was being used by JUSTIN WHITE and was executed on January 7, 2022.

On January 26, 2022, your affiant received a signed search warrant approved by Honorable Judge Rachel Hughey to search JUSTIN WHITE's residence located at [XX] 10th Street South, Apartment [XXXX], Minneapolis, MN 55403.

On February 1, 2022, agents from the Drug Enforcement Administration executed the search warrant for JUSTIN WHITE's residence located at [XX] 10th Street South, Apartment [XXXX], Minneapolis, MN 55403. Agents observed and seized suspected fentanyl, cocaine, LFA Pill Press, two (2) firearms and $25,190.00 dollars in United States Currency. On the same day, the Minneapolis Police Department assisted in the arrest of JUSTIN WHITE, who was operating his vehicle, 2018 Range Rover Velar MN plate [XXXX9550] VIN# [ ]. Search incident to arrest, officers located suspected fentanyl, cocaine, marijuana, several telephones and one (1) firearm. The 2018 Range Rover Velar MN plate [XXXX9550] VIN# [ ] was towed to the Minneapolis Police Department impound lot located in the city of Minneapolis. The vehicle was placed in the secure holding area.

The geolocation data for the telephone being utilized by JUSTIN WHITE, places the telephone inside the impound lot for the Minneapolis Police Department. This means that JUSTIN WHITE'S cell phone is inside the Range Rover. Your affiant request permission to enter JUSTIN WHITE'S vehicle to retrieve his cell phone, as your affiant believes JUSTIN WHITE'S cell phone could potentially contain information of value that could further prove his involvement with drug trafficking.

(Gov't Ex. 5 at 3-4; Dkt. 77 at 64-66.)

White argues that the evidence seized as a result of this search warrant should be suppressed because it is the fruit of the previous illegal search warrants. (Dkt. 77 at 16; Dkt 80 at 16.) The Court rejects this argument because the Court has concluded that previous warrants challenged by White were supported by requisite probable cause. The

totality of the circumstances regarding the evidence of narcotics trafficking involving White, the relationship between the cell phone sought by the warrant and the pill press, the location of the cell phone in the Range Rover based on the GPS tracking information, the fact that he was arrested from the Range Rover and found to have cell phones and narcotics, and the fact that cell phones are known tools of the drug trade[11] leads this Court to find that there was a fair probability that evidence of a crime involving narcotics would be located inside of the Range Rover.  Therefore, the motions to suppress evidence resulting from this search warrant should be denied.

### 6.    *Leon* Exception

White argues that *Leon* good-faith exception does not apply because of the affiant's disregard of the truth and on the basis that the issuing judges "rubber stamped" the search warrants as evidenced by if the judges would have asked more question regarding the pill press they would have discovered the level of governmental involvement in allowing him to have the pill press.  (Dkt. 58 at 12-13.)  Because the search warrants were supported by probable cause, the Court need not determine whether the *Leon* good-faith exception should apply.[12]

---

[11]    *See United States v. Oliver*, No. CR 15-164 (DSD/BRT), 2015 WL 13731345, at *9 (D. Minn. Oct. 13, 2015) (finding in the context of examining probable cause for the issuance of search warrants for cell phones that "cell phones are recognized tools of the drug trade. . . .") (citations omitted), *R. & R. adopted*, 2015 WL 7432334 (D. Minn. Nov. 23, 2015); *see generally, Riley v. California*, 573 U.S. 373, 401 (2014) ("Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information.").

[12]    The Government does not appear to have responded to this argument or made any *Leon* argument.  (*See* Dkts. 30, 61, 70.)

C.    **Motion to Suppress Statements, Admissions and Answers (Dkt. 25)**

The Government represents that it is not aware of any statements or admissions that will be used in this case against White.  (Dkt. 30 at 12.)  Therefore, this Motion should be denied as moot.

## IV.    <u>ORDER</u>

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:** Defendant Justin White's request for a *Franks* hearing in his Pro Se Motions and Memorandum for Suppression Due to Illegal Search in Seizure (Dkt. 58) is **DENIED**.

## V.    <u>REPORT AND RECOMMENDATION</u>

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.    Defendant Justin White's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 24); Defendant Justin White's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence (Dkt. 26); Defendant Justin White's Pro Se Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct (Dkt. 57); Defendant Justin White's Pro Se Motions and Memorandum for Suppression Due to Illegal Search in Seizure (Dkt. 58); and Defendant Justin White's Supplemental Pro Se Motions and

Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous

Government Misconduct (Dkt. 80) be **DENIED**.

    2.      Defendant Justin White's Motion to Suppress Statements, Admissions and

Answers (Dkt. 25) be **DENIED** as moot.


DATED: June 5, 2023          *s/Elizabeth Cowan Wright*
                              ELIZABETH COWAN WRIGHT
                              United States Magistrate Judge


## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).