**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

UNITED STATES,

                                  Criminal No. 22-207 (JRT/ECW)

                Plaintiff,

v.

                          **MEMORANDUM OPINION AND ORDER**
JUSTIN WHITE,                    **ADOPTING MAGISTRATE JUDGE'S**
                                      **REPORT AND RECOMMENDATION**

                Defendant.

---

Nathan Hoye Nelson, **UNITED STATES ATTORNEY'S OFFICE,** 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff.

Justin White, SPN 6990, Sherburne County Jail, 13880 Business Center Drive Northwest, Elk River, MN 55330, a pro se Defendant.

Defendant Justin White is currently charged with possession with intent to distribute fentanyl, being a felon in possession of a firearm, and possession of a firearm in furtherance of a drug trafficking crime.[1]  White, by and through his former counsel and later appearing pro se, filed various motions to suppress evidence.  Magistrate Judge Elizabeth Cowan Wright issued a Report and Recommendation ("R&R") recommending the Court deny all six suppression motions.  White objects to the R&R, claiming the

---

[1] Though White seemingly suggests that he was also charged with "illegal possession of manufacturing tools" but because the TDP pill press did not satisfy the relevant regulations, that charge is not in his Indictment.  (*Compare* Def.'s Reply Mem. at 1, July 28, 2023, Docket No. 92, *with* Indictment, Aug. 23, 2022, Docket No. 1.)

evidence should be suppressed as fruit of the poisonous tree because the Drug Enforcement Administration ("DEA") engaged in entrapment and outrageous government conduct by not intercepting White's shipment for a TDP 5 pill pressing machine after learning it was ordered using a fraudulent driver's license. White also asserts that there was no probable cause to support the search warrants because the canine sniffs of his apartment building's hallway violated his Fourth Amendment rights, and there were potentially innocent explanations for the interactions that officers suspected to be drug dealings.

Because White has not demonstrated entrapment or outrageous government conduct, because the totality of the circumstances demonstrates there was probable cause supporting the search warrants, and because the other warrants were each supported by probable cause, the Court will overrule White's objections, adopt the Magistrate Judge's R&R, and deny his suppression motions. The Court will also deny White's Motion to Suppress Statements, Admissions and Answers as moot.

**BACKGROUND**

**I.     FACTS**

Sergeant Walter Alvarado is a licensed police officer with the Minneapolis Police Department ("MPD") assigned to the DEA Task Force. (Pl.'s Ex. 1 at 2.) The DEA received a tip that an individual had purchased an LFA Machines DWF, LLC pill press model TDP 5 (the "TDP"). (*Id.*) Narcotics traffickers utilize pill press machines like the TDP to produce

pills that mimic the shape of prescription drugs and utilize illicit narcotics. (*Id.*) Pill presses are often used to create counterfeit Oxycodone pills, known as "M30s," using fentanyl. (*Id.*) The TDP is capable of producing approximately 5,000 pills an hour. (*Id.*) In order to purchase a TDP, federal regulations require that a purchaser provide a copy of their driver's license and bank account information. The tipster indicated that the purchaser had provided a driver's license bearing the name "James Watkins" and a 763-606-XXXX phone number. (*Id.* at 3.) The TDP was shipped to an address on Arkwright Street North in St. Paul, MN. (*Id.*) The DEA queried the Minnesota DVS Access database and learned that a fraudulent driver's license and bank account had been used for the purchase. (*Id.*)

The TDP shipment was scheduled to arrive at Arkwright Street North on December 29, 2021. (*Id.*) Sergeant Alvarado and other DEA and Federal Bureau of Investigation officers surveilled Arkwright Street North and observed White's vehicle pull up to the address. (*Id.*) White waited until the delivery truck arrived, at which point White exited his vehicle, waved down the delivery driver, and the delivery driver helped White load the TDP shipment into the vehicle. (*Id.*) White then left the address on Arkwright Street North. (*Id.*)

Special Agent Matthew Cutcher followed White, who drove to another location in St. Paul. (*Id.*) White met with an individual, Case Ritzman, and the agent observed them appear to inspect the shipments inside of White's vehicle. (*Id.* at 3–4.) White then departed alone and drove to an apartment building in Minneapolis. (*Id.* at 4.) Ritzman

was waiting for White at the apartment building.  (*Id.*)  Ritzman and White then unloaded the shipment boxes and brought them into the apartment.  (*Id.*)  They then departed in separate vehicles.  (*Id.*)

With permission from the apartment building's management, a police officer for the Bloomington Police Department brought her canine to the apartment building on two occasions.  (*Id.*)  Both times, the dog gave a positive alert for narcotics outside of Apartment 1515.  (*Id.*)  Apartment 1515 is rented by "Justin Bell."  (*Id.*)  For two weeks, various agents surveilled Apartment 1515, but did not observe any individuals coming or going from the apartment other than White.  (Pl.'s Ex. 2 at 6.)  Agents also surveilled White and observed him make several short stops at different locations in a 2018 Land Rover Velar.  (*Id.*)  In one instance, the agents observed White pull his vehicle to the curb in front of a store, a man enter White's vehicle, and then the man exit the vehicle and walking away approximately one minute later.  (*Id.*)  The officers noted that this type of activity is indicative of narcotics distribution.  (*Id.*)

Based upon this information, Sergent Alvarado applied for and received a no-knock entry "sneak and peek" search warrant for Apartment 1515 on January 26, 2022.  (*Id.*)  Law enforcement utilizing a "sneak and peek" search warrant search and photograph items of evidentiary value, but do not seize the items.  (*Id.* at 6–7.)  The search warrant was executed on February 1, 2022, during which agents observed two handguns, magazines, and ammunition; the TDP with blue powder on it; an additional supply of blue

powder; several bags of additional powders used to "cut" illicit narcotics; and at least one baggie of "M30" pills. (*Id.* at 7.)

DEA agents consequently requested and received a warrant to search and seize the items in Apartment 1515. (*Id.* at 12.) The warrant also allowed the agents to search White and a 2018 Land Rover. (*Id.* at 9.) The agents later received a mobile tracking warrant for the 2018 Range Rover Velar that White had been observed driving on multiple occasions. (Pl.'s Ex. 4 at 4–5.) Shortly thereafter, DEA agents received a warrant to search the 2018 Range Rover Velar and retrieve all cellular phones and any illegal drugs or related paraphernalia. (Pl.'s Ex. 5 at 1.) Finally, DEA agents received a warrant to access the cellular data of the 763-606-XXXX phone, including its call records, location technology, and subscriber information. (Pl.'s Ex. 3.)

DEA agents executed the search warrant for Apartment 1515 and seized substances suspected to be fentanyl and cocaine, the TDP, two firearms, and over $25,000 in cash. (Pl.'s Ex. 5 at 2.) They also arrested White while he was driving the 2018 Range Rover Velar and found suspected fentanyl, cocaine, marijuana, several telephones, and one firearm during the search incident to his arrest. (*Id.*)

II.   **PROCEDURAL HISTORY**

White was indicted on August 23, 2022, for possession with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and for

possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).  (Indictment, Aug. 23, 2022, Docket No. 1.)

James Ventura was appointed to serve as White's counsel.   (Order for Appointment of Counsel, Sept. 1, 2022, Docket No. 8.)  Of relevance to this order, White filed three motions by and through Ventura.  First, he filed a Motion to Suppress Evidence Obtained as a Result of Search and Seizure.  (1st Mot. Suppress Evid., Sept. 23, 2022, Docket No. 24.)  Second, he filed a Motion to Suppress Statements, Admissions and Answers.  (Mot. Suppress Statements, Sept. 23, 2022, Docket No. 25.)  Lastly, White filed a Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence. (Mot. Suppress Wire Evid., Sept. 23, 2022, Docket No. 26.)

Later, White requested the Court allow him to represent himself, which the Court granted.  (Order, Mar. 15, 2023, Docket No. 67.)  The Court appointed standby counsel for White.  (Order for Appointment of Standby Counsel, Mar. 17, 2023, Docket No. 69.) White has since filed several pro se evidentiary motions, including a Pro Se Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct (Docket No. 57), a Pro Se Motions and Memorandum for Suppression Due to Illegal Search in [sic] Seizure (Docket No. 58), and a Pro Se Supplemental Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct (Docket No. 80).

The Magistrate Judge issued an R&R concluding that White failed to demonstrate he was induced, so the Court should dismiss his motions with respect to his defense of entrapment.  (R. & R. at 10, June 5, 2023, Docket No. 84.)  Because the government's conduct did not rise to the level of "outrageous conduct," the Magistrate Judge recommended the Court deny White's motions to dismiss and suppress based on outrageous conduct.  (*Id.* at 14.)  The Magistrate Judge also found that there was probable cause for each of the search warrants.  (*Id.* at 17.)[2]

White timely objected to the R&R on two grounds.  (*See* Obj., July 12, 2023, Docket No. 90.)  First, he challenges the Magistrate Judge's finding that there was no outrageous government misconduct because the DEA "allowed" White to possess the TDP by not intercepting the suspicious TDP shipment.  (*Id.* at 3.)  White alleges the DEA's inaction, despite the suspicion of illegal activity, demonstrates that the government contributed to his "illegal pill manufacturing enterprise," which constitutes entrapment.  (*Id.* at 7, 12.)  Second, White seems to claim that there was insufficient probable cause for the search warrants because the dog sniffs were conducted without a warrant and in a constitutionally protected area, and there were potentially innocent explanations for the

---

[2] In addition to recommending the Court deny White's motions to suppress, the R&R also ordered that White's request for a *Franks* hearing on his Pro Se Motions and Memorandum for Suppression Due to Illegal Search in Seizure (Docket No. 58) be denied.  (R. & R. at 44.)  Because this is a non-dispositive motion that the Magistrate Judge may rule on, and because White has not raised the *Franks* order specifically in his objections to the R&R, the Court finds the order is unchallenged and will not address it here.

interactions the DEA surveillance team observed.  (*Id.* at 10–11.)  The United States urges the Court to adopt the R&R.  (Resp. Obj., July 26, 2023, Docket No. 91.)

## DISCUSSION

### I.   STANDARD OF REVIEW

After a magistrate judge files an R&R, a party may "serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Civ. P. 72(b)(2); *accord* D. Minn. LR 72.2(b).  "The objections should specify the portions of the magistrate judge's report and recommendation to which objections are made and provide a basis for those objections."  *Mayer v. Walvatne*, No. 07-1958, 2008 WL 4527774, at *2 (D. Minn. Sept. 28, 2008).  For dispositive motions, the Court reviews de novo a "properly objected to" portion of an R&R.  Fed. R. Civ. P. 72(b)(3); *accord* D. Minn. LR 72.2(b)(3).  "Objections which are not specific but merely repeat arguments presented to and considered by a magistrate judge are not entitled to de novo review, but rather are reviewed for clear error."  *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015).

### II.   ANALYSIS

Because White's motions to suppress are dispositive, the Court will review them de novo.  *See* LR 72.1(a)(3)(A) (identifying motions to dismiss an indictment and motions to suppress evidence as dispositive pretrial motions in criminal cases).  The Court categorizes White's Objections to the R&R into two categories: (1) motions related to the

government's alleged entrapment and outrageous misconduct, and (2) motions challenging the searches for lack of probable cause. The Court will take each in turn.

### A.    Entrapment and Outrageous Government Conduct

White asserts that the government manufactured two crimes: an illegal pill manufacturing operation and the illegal possession of an unregistered TDP. (Reply at 2, July 28, 2023, Docket No. 92.) Because the DEA knew that the TDP had been purchased using a faulty driver's license and it did not take steps to stop the delivery of the TDP, White asserts that the DEA was responsible for him being in possession of the "illegal TDP." (*Id.* at 3.) Accordingly, he believes that all evidence derived after the DEA's misconduct should be excluded as fruit of the poisonous tree. (*Id.* at 3.) However, White is mistaken. The DEA's conduct constitutes neither entrapment nor outrageous government conduct.

### 1.    Entrapment

Under the fruit of the poisonous tree doctrine, evidence should be excluded if it was obtained directly or indirectly through the exploitation of police illegality. *United States v. Simpson*, 439 F.3d 490, 493–94 (8th Cir. 2006). White asserts that the evidence obtained in this case should be suppressed under the doctrine of entrapment. Entrapment is an affirmative defense that is a question of fact generally decided by a jury. *United States v. Young*, 613 F.3d 735, 746 (8th Cir. 2010). A defendant is only entitled to an entrapment jury instruction where there is sufficient evidence from which a reasonable jury could find entrapment. *Id.*

A valid entrapment defense has two elements: (1) government inducement of a crime, and (2) a lack of predisposition on the part of the defendant to engage in criminal conduct. *Id.* "Inducement occurs when the government creates a substantial risk that an otherwise law-abiding person will commit a criminal offense." *United States v. Harriman*, 970 F.3d 1048, 1057 (8th Cir. 2020) (internal quotation marks omitted). Entrapment often involves "pressure, assurances that the person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship." *Id.* (quoting *United States v.* Clarett, 907 F.3d 1100, 1102 (8th Cir. 2018)). Once a defendant establishes inducement, the burden shifts to the government to demonstrate that the defendant was predisposed to the criminal activity. *Young*, 44 F.4th at 747. However, "[w]here the government simply offers a defendant an opportunity to commit a crime, and the defendant promptly avails himself of the criminal opportunity, the defendant is not entitled to an instruction on entrapment." *United States v. Combs*, 827 F.3d 790, 796 (8th Cir. 2016).

Here, White has not shown entrapment because he failed to show that the DEA induced him to purchase the TDP—let alone acquire the firearms and drugs also found in his possession. The DEA did not initiate contact with White, influence his behavior, or introduce the idea of manufacturing pills to him. *See United States v. Tobar*, 985 F.3d 591, 593 (8th Cir. 2021) (listing factors courts consider in finding inducement). There is no evidence that the DEA "implanted the criminal design in the [White's] mind" because the

DEA did not learn about the TDP until after White purchased it.  All evidence currently before the Court demonstrates that White voluntarily purchased the TDP.

To the extent that White argues the DEA acted improperly by not intervening after it learned of potential criminal activity, that argument fails because there is no entrapment "[w]here the government simply offers a defendant an opportunity to commit a crime, and the defendant promptly avails himself of the criminal opportunity." *Combs*, 827 F.3d at 796.  That is exactly what occurred here.  Moreover, White misunderstands the DEA's role in overseeing the sale of materials such as TDPs.  Though the domestic purchase of pill presses must be reported to the DEA under 21 C.F.R. § 1310.05(b)(2), there is no regulatory requirement that the DEA approve such transactions or cancel them when they appear suspicious.  *See* 21 C.F.R. § 1310 *et seq.* (setting forth the regulations governing the records and reports of certain chemicals and machines).

White also relies on several cases to assert he was not predisposed to criminal activity and asserts that this was a "reverse sting operation."  (Obj. at 15–17.)  He cites to *Hampton v. United States*, 425 U.S. 484 (1976), and *Ellison v. Jeffries*, No. 3:05-967, 2007 WL 1577795 (N.D. Ohio Mar. 16, 2007), among other cases.  The Court need not consider whether White was predisposed to commit the crime, however, because he has failed to satisfy the first element for entrapment: inducement.  Because White has failed to show that he was induced into possessing the TDP, firearms, or drugs, his entrapment argument fails.

### 2.      Outrageous Government Conduct

White also suggests that the DEA's failure to stop the TDP shipment constitutes outrageous government conduct.  "The defense of outrageous government conduct is similar to, although different from, the defense of entrapment.  Whereas the defense of entrapment focuses on the predisposition of the defendant to commit the crime, the defense of outrageous government conduct focuses on the government's actions." *United States v. Hunt*, 171 F.3d 1192, 1195 (8th Cir. 1999) (citation omitted).  The Eighth Circuit has recognized the defense of outrageous government conduct but reserves it for "the most intolerable government conduct" that is "so outrageous and shocking that it exceeds the bounds of fundamental fairness."  *Id.* (cleaned up) (internal quotations omitted).  "The level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court."  *Id.* (citation omitted).

As previously mentioned, the DEA is under no obligation to cancel or otherwise intervene when an individual suspiciously purchases a pill press like the TDP.  Even if the DEA "provided" White with the TDP like he asserts, "the government may supply some item of value" for a drug scheme without it rising to outrageous government conduct.  *Hunt*, 171 F.3d at 1195.  The Court concludes that White has set forth no evidence that the DEA's conduct was so outrageous that it "shocks the conscience" of the Court.  Accordingly, his outrageous government conduct argument fails.

Moreover, White's reliance on *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), is misplaced.  In *Greene*, an undercover agent encouraged defendants to resume a discontinued bootlegging operation, provided necessary materials, threatened the defendants to accelerate production, and served as the defendants' sole customer.  *Id.* at 786–87.  The Ninth Circuit overturned the defendant's conviction on outrageousness grounds, holding that the government may not "involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators."  *Id.* at 787.  *Greene* is inapplicable here because there is no evidence that the DEA "created" White's illegal pill operation.  White purchased the TDP on his own—without any DEA involvement—and he possessed the firearms and drugs on his own accord.  DEA was not directly or continuously involved in White's criminal activity.

Because the DEA's failure to stop the TDP pill press shipment amounts to neither entrapment nor outrageous government conduct, White has failed to show that evidence derived therefrom is the fruit of the poisonous tree.  The Court will therefore deny his motions to suppress on these grounds.  Thus, White's Pro Se Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct (Docket No. 57) and White's Pro Se Supplemental Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct (Docket No. 80) will be denied.

B.      **Probable Cause for Search Warrants**

Next, White objects to the Magistrate Judge's finding that there was probable cause to support the warrants to search his apartment, person, and vehicle.  (Obj. at 10–11.)  This objection relates to his Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket No. 24) and his Pro Se Motions and Memorandum for Suppression due to Illegal Search in Seizure (Docket No. 58).  He suggests it was unconstitutional for the canine to sniff the hallway of the apartment building because it was not "a common hallway," and the alleged drug deals that the agents witnessed could have had innocent, legal explanations.  (*Id.*)

The Fourth Amendment requires that a search warrant be issued only if it is supported by probable cause.  U.S. Const. amend. IV.  In determining whether probable cause exists, the search warrant must demonstrate that given all the circumstances set forth in the affidavit, there is a "fair probability" that contraband or evidence of a crime will be found in a particular place.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  This requires the issuing judge to look at the totality of the circumstances.  *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998).  When a search warrant is based solely on an affidavit, courts may only consider "that information which is found within the four corners of the affidavit" to determine the existence of probable cause.  *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citation omitted).

The "chief evil" deterred by the Fourth Amendment is the physical invasion of the home.  *Payton v. New York*, 445 U.S. 573, 585 (1980).  An individual's right to be "free

from unreasonable governmental intrusion" into their home is vital to the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (citation omitted). To justify the search of a home there must be "sufficient nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citation omitted).

### 1. Apartment Hallway Search

First, White asserts that the DEA unconstitutionally searched the hallway of his apartment building when it conducted the canine sniffs. But White's arguments fail because the hallway outside Apartment 1515 is not a constitutionally protected area. *See United States v. Brooks*, 645 F.3d 971, 876 (8th Cir. 2011) ("[T]here exists no 'generalized expectation of privacy in the common areas of an apartment building.'") (quoting *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999)).

White suggests that the hallway was constitutionally protected because it was locked and not open to the public. But what matters is not whether the hallway was open to the public, but whether it was considered a "common" area. *See United States v. Scott*, 610 F.3d 1009, 1015–16 (8th Cir. 2010) (holding that the officer's use of the drug-sniffing dog did not constitute an unconstitutional Fourth Amendment search because the sniff occurred in a common hallway, the police officers were lawfully present, and Scott had no legitimate privacy interest in the drugs that the dog smelled). It does not matter if the hallway is open to the public—it only matters if it is accessible to other tenants. *See Common Area*, Black's Law Dictionary (11th ed. 2019). Moreover, the K9 team was

lawfully present because they received permission from the apartment building management to be there.  (Pl.'s Ex. 1 at 4.)

Additionally, White's argument that the hallways is considered constitutionally protected "curtilage" similarly fails.  Though the hallway is immediately outside Apartment 1515, the hallway is open to other tenants in the building.  It is not an enclosure or area that is protected from observation by people passing by.  *See United States v. Penalozo-Romero*, No. 13-36, 2013 WL 5472283, at *7 (D. Minn. Sept. 30, 2013) ("[I]t cannot be said the common hallway of the apartment building was curtilage. . . . A common hallway is used by residents to travel from their apartment to the outside door and back.  This is not the area in which 'intimate activities' are likely to occur.").  Thus, the apartment building's common hallway cannot constitute curtilage.

White had no constitutionally protected interest in the apartment building's common hallway.  Accordingly, it was not a violation of his Fourth Amendment rights for the government to conduct dog sniffs outside Apartment 1515.  The Court will therefore deny White's motions to suppress evidence on these grounds.

### 2.   Surveillance

White also asserts that the affidavits submitted in support of the search warrants did not give rise to probable cause because there were potentially innocent explanations for the conduct the DEA agents observed while surveilling White.  "When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in

determining the existence of probable cause." *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999).  Each affidavit at issue here detailed the DEA's surveillance of White.  (*E.g.,* Pl.'s Ex. 2 at 6.)  Agents conducted surveillance on White driving the Land Rover for approximately two weeks.  (*Id.*)  The agent explained that the type of activity observed was "indicative of narcotics distribution."  (*Id.*)

White argues that the DEA's surveillance of him does not give rise to probable cause because there are potentially innocent reasons for his short stops.  For instance, he claims that he could have wanted "to show friends in [sic] family a new vehicle that he had just purchased."  (Obj. at 11.)  The supposed drug deal in which an individual got into White's vehicle could simply be a "neighbor that had forgotten something In [sic] the defendants [sic] car who was seeking to recover his property."  (*Id.*)  These arguments are creative but unavailing.

Probable cause is a commonsense question determined based on the totality of the circumstances.  *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007).  Even if there are potentially innocent reasons for White's frequent stops, the affidavits detailed other instances that support a "fair probability that contraband or evidence of a crime w[ould] be found" in White's apartment, vehicle, and on his person.  *Gates*, 462 U.S. at 238.  For instance, the affidavits noted the K9's positive alerts for the presence of a narcotic odor outside Apartment 1515.  (*E.g.,* Pl.'s Ex. 2 at 6.)  They detailed White's TDP purchase using a fraudulent driver's license.  (*Id.* at 5.)  The TDP purchase and the K9

positive alert for narcotics both highly suggest that White was involved in drug-related criminal activity.  Because the drug-sniffing canine gave the positive alert right outside the apartment, and DEA agents observed White bring the TDP into the building, there was a fair probability that drug-related evidence would be found in Apartment 1515. Moreover, those facts, combined with the agents' surveillance of White and his frequent vehicle stops that appeared to be narcotics transactions, suggest there was a fair probability that drug-related evidence would be found on his person and in his vehicle. Given the totality of the circumstances, the search warrants were certainly supported by probable cause.

### 3.    *Leon* Good Faith Exception

Even if the search warrants were not supported by probable cause, the Court would nevertheless deny White's motions to suppress.  Although the ordinary sanction for searches conducted in the absence of probable cause is suppression of the evidence recovered in the illegal search, this exclusionary rule is not applicable "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011) (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984)).  Among other circumstances, an officer does not rely on a warrant in good faith when the affidavit supporting the warrant contained reckless, knowing, or intentionally false statements that misled the issuing judge or was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.*  (quotation marks and citations omitted).  In

-18-

determining whether the executing officer had an objectively reasonable belief that probable cause existed, the Court considers the totality of the circumstances, including information known to the officer but not presented to the issuing judge. *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). Simply put, the "objectively ascertainable" inquiry is whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances. *Herring v. United States*, 555 U.S. 135, 145 (2009).

Here, White has presented no evidence that suggests that the agents who executed the search warrants acted objectively unreasonably in relying on the warrants. The Court also finds that the affidavits were not so facially lacking in probable cause as to preclude reasonable reliance on them because each affidavit detailed the DEA's observations of White and specifically listed the evidence they sought to obtain. (*E.g.*, Pl.'s Ex. 2.) Thus, there is no evidence that law enforcement acted unreasonably in relying on the resulting warrants.

Because the search warrants were supported by probable cause and, even if they were not, they would fall under the *Leon* good faith exception, the Court will deny White's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket No. 24) and White's Pro Se Motions and Memorandum for Suppression due to Illegal Search In Seizure (Docket No. 58).

III.   **MOTION TO SUPPRESS WIRE INTERCEPTIONS, ELECTRONIC SURVEILLANCE, AND OTHER EVIDENCE**

Though not addressed in White's Objections to the R&R, the Court will consider Defendant's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence for the sake of completeness.  (*See* Mot. Suppress Wire Evid.)  The United States asserts that there are two tracking warrants that would fall under this motion: the cellular data warrant for the 763-606-XXXX cellular phone (Pl.'s Ex. 3), and a tracking warrant for the 2018 Range Rover Velar (Pl.'s Ex. 4.)   The Court concludes that each warrant was supported by probable cause.

   **A.  Cellular Data Warrant**

A warrant was issued on January 7, 2022, pursuant to 18 U.S.C. §§ 2703(d), 3122(a)(2), and 3123, and Minn. Stat. §§ 626A.36–.42, authorizing the installation and use of a pen register and trap and trace device for the 763-606-XXXX cellular phone.  (Pl.'s Ex. 3.)   The information sought the identification of incoming and outgoing callers, call records, the cellular tower location and service information, global positioning system information, and other tracking data.  (*Id.* at 10–11.)

Law enforcement must have a warrant based on probable cause to access cell phone records.  *United States v. Thompson*, 976 F.3d 815, 822 (8th Cir. 2020) (citing *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018)).  Minnesota law specifically requires a finding that "there is a reason to believe that the information likely to be obtained . . . is relevant to an ongoing criminal investigation."  Minn. Stat. § 626A.37.  Cell

phone searches are also subject to the *Leon* good faith exception.  *Thompson*, 976 F.3d at 823.

Here, the affidavit submitted with the warrant application supports a finding of probable cause.  Sergeant Alvarado's affidavit provides an overview of the DEA's investigation into White for distribution of controlled substances in the Twin Cities metro area.  (Pl.'s Ex. at 4.)  The affidavit summarizes White's purchase of the TDP using a fraudulent driver's license.  (*Id.* at 4–5.)  Sergeant Alvarado noted in the affidavit that utilizing a fraudulent driver's license, a fraudulent bank account, and random addresses for delivery and drop off of the TDP was likely a tactic to avoid law enforcement detection. (*Id.* at 5.)  He wrote that, based on his training and experience, "examining call detail records and historical cell site data will aid Law Enforcement in identifying possible co-conspirators" and previous locations that White visited, which will assist law enforcement in locating White and places of operation.  (*Id.*)  These statements in the affidavit support a finding of probable cause.  White's purchase of the TDP under suspicious circumstances reasonably indicates he may be involved in illegal drug activity, and it was reasonable to believe that his cell phone data would reveal evidence related to the DEA's investigation.

Even if there was not probable cause, the Court would nevertheless deny White's suppression motion because the good-faith exception applies.  White has set forth no evidence that suggests the DEA agents and officers unreasonably relied on the warrant. The warrant specifically stated that the "Court also finds that the facts alleged by the

-21-

Affiant constitute probable cause to believe that the person who possesses the electronic device is committing, has committed, or is about to commit a crime, and that execution of this Warrant will result in the discovery of evidence of said crime." (Pl.'s Ex. at 9.) Because the warrant expressly stated that there was probable cause, and the affidavit was not facially defective, the officers' reliance on the warrant would fall within the good-faith exception.

### B. Vehicle Tracking Warrant

White also challenges the warrant issued for mobile tracking of the 2018 Range Rover Velar. (Pl.'s Ex. 4.) In the warrant affidavit, Sergeant Alvarado reiterated much of the information included in the other warrant applications, such as White's purchase of the TDP and the two positive narcotics canine alerts outside of Apartment 1515. (*See generally id.*) Sergeant Alvarado also detailed multiple occasions in which DEA agents and officers observed White driving the 2018 Range Rover Velar. (*Id.* at 4–5.) He noted that on January 27, 2022, Special Agent Matthew Cutcher observed the 2018 Range Rover Velar pull up to a red light and a man jumped into the passenger seat. (*Id.*) The light changed to green, the vehicle drove approximately two blocks, and then pulled over again and the man exited the car and walked away. (*Id.*) Because this activity occurred in an area that is notorious for drug trafficking, crime, and violence, Sergeant Alvarado believed it was potentially a drug deal. (*Id.*) Based upon this information, Sergeant Alvarado requested that a mobile tracking device be installed on the Range Rover to obtain real-time location information about the vehicle because such information "will tend to show

-22-

particular elements of a criminal activity or that the vehicle or object is involved in committing crimes." (*Id.* at 5.)

The information provided in Sergeant Alvarado's affidavit supports a finding of probable cause. Given the location of the vehicle and the suspicious activity that resembled a drug deal, as well as White's purchase of the TDP using a fraudulent driver's license, it was reasonably likely that vehicle tracking would reveal information about White's narcotics trafficking. Even if there was not probable cause, the evidence obtained would not be suppressed because it falls within the good-faith exception to the warrant requirement. The warrant-issuing court iterated that "there is Probable Cause to believe that a crime has/will be committed and the installation and use of an Electronic and/or Mechanical Mobile Tracking Device or System will result in the discovery of evidence" related to the criminal activity. (Pl.'s Ex. at 7.) White has put forth no evidence suggesting that the agents unreasonably relied on that warrant or that Sergeant Alvarado's affidavit was so facially defective that it was unreasonable to be relied upon.

Because the warrants for the cellular data and the tracking of the 2018 Range Rover Velar were supported by probable cause, the Court will deny White's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence (Docket No. 26).

## IV. MOTION TO SUPPRESS STATEMENTS, ADMISSIONS AND ANSWERS

Finally, the Magistrate Judge recommends that the Court deny White's Motion to Suppress Statements, Admissions and Answers as moot. (*See* Mot. Suppress Statements.) White did not address this recommendation in his Objections to the R&R. The United

States represents that it is not aware of any statements or admissions that will be used against White.  (Pl.'s Resp. Pretrial Mots. at 12, Oct. 7, 2022, Docket No. 30.)  Accordingly, there are no statements, admissions, or answers to suppress, and the Court will deny this motion as moot.

## CONCLUSION

Because the DEA was under no obligation to stop the criminal activity and their failure to act does not constitute inducement or outrageous government conduct, White's objections fail and the Court will adopt the R&R's recommendation to deny White's motion to suppress.  Moreover, the Court concludes that the warrants were supported by probable cause based on the totality of the circumstances.  Accordingly, the Court will overrule each of White's objections, adopt the R&R, and deny his suppression motions.  It will also deny his Motion to Suppress Statements, Admissions and Answers as moot.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Objections to the Report and Recommendation [Docket No. 90] are **OVERRULED;**

2.  The Magistrate Judge's Report and Recommendation [Docket No. 84] is **ADOPTED;**

3.  Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 24] is **DENIED;**

4.  Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 25] is **DENIED as moot;**

5.  Defendant's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence [Docket No. 26] is **DENIED;**

6.  Defendant's Pro Se Motions and Memorandum for Suppression and Dismissal Due to Entrapment and Outrageous Government Misconduct [Docket No. 57] is **DENIED;**

7.  Defendant's Pro Se Motions and Memorandum for Suppression Due to Illegal Search In Seizure [Docket No. 58] is **DENIED;**

8.  Defendant's Pro Se Supplemental Motions and Memorandum for Suppression and Dismissal due to Entrapment and Outrageous Government Misconduct [Docket No. 80] is **DENIED.**

DATED: August 29, 2023
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
United States District Judge